**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**EL DORADO DIVISION**

QCX LLC, d/b/a Polymarket US,

*Plaintiff*,

v.

TIM GRIFFIN, in his official capacity as Attorney General of Arkansas; ALEX LIEBLONG, in his official capacity as Chairman and Commissioner of the Arkansas Racing Commission; MARK LAMBERTH, in his official capacity as Commissioner of the Arkansas Racing Commission; STEVE ANTHONY, in his official capacity as Commissioner of the Arkansas Racing Commission; DENNY EAST, in his official capacity as Commissioner of the Arkansas Racing Commission; MICHAEL POST, in his official capacity as Commissioner of the Arkansas Racing Commission; JOHN SCHMELZLE, in his official capacity as Commissioner of the Arkansas Racing Commission; and STEVE LANDERS, in his official capacity as Commissioner of the Arkansas Racing Commission,

*Defendants*.

Case No.: 1:26-cv-01076-TLB

**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. This action seeks to prevent imminent and irreparable harm arising from Arkansas' anticipated enforcement of state gambling laws against federally regulated derivatives exchanges—enforcement that Congress prohibits. Plaintiff QCX LLC, d/b/a Polymarket US, operates a lawful, nationwide designated contract market subject to the exclusive jurisdiction of the Commodity Futures Trading Commission ("CFTC" or "the Commission").

2. Through the Commodity Exchange Act ("CEA"), Congress vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets. Among the financial instruments subject to the CFTC's exclusive jurisdiction are event contracts, a type of derivative (specifically, a swap) whose value depends on the outcome of real-world events.

Polymarket US offers event contracts for trading on a CFTC-regulated exchange. Exercising its comprehensive, exclusive authority, the CFTC decides whether to prohibit certain event contracts as contrary to the "public interest." 7 U.S.C. § 7a-2(c)(5)(C). Despite this congressional grant of authority, the State claims for itself the same power.

3. Arkansas is attempting to relitigate a debate Congress settled over 50 years ago. Back then, too, States treated derivatives trading as unlawful gambling. That is one reason why, in 1974, Congress amended the CEA to grant the CFTC "exclusive jurisdiction" over certain derivatives "traded or executed on a contract market designated" under the Act. 7 U.S.C. § 2(a)(1)(A). When States objected, Congress answered by spelling out the "Jurisdiction of States" in the Act itself: A State may sue to enforce the CEA only against persons "*other than* a contract market"; Congress preserved the State's jurisdiction to wield state law only when bringing an enforcement action "on the basis of a[] . . . general civil or criminal antifraud statute." 7 U.S.C. § 13a-2(1), (7) (emphasis added). In other words, Congress has already decided that the enforcement Arkansas envisions—and has commenced against Polymarket US's peer—is not Arkansas' to pursue.

4. Since then, Congress has repeatedly expanded the CFTC's exclusive authority to cover new derivatives—including event contracts—traded on federally regulated contract markets. As the Third Circuit recently recognized, "the text of the Act preempts otherwise applicable state laws that purport to regulate . . . event contracts on CFTC-licensed [contract markets]." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026). For the same reason, another court in this Circuit preliminarily enjoined Minnesota from enforcing against Polymarket US state law that would likely "regulate transactions over which the CFTC has

'exclusive jurisdiction.'" *United States v. Minnesota*, --- F. Supp. 3d ----, 2026 WL 2150211, at *14–15 (D. Minn. July 27, 2026).

5. The CFTC has since removed any doubt that Polymarket US's event contracts are swaps with respect to which the CFTC has exclusive jurisdiction. In light of the "debate regarding the scope of the [CFTC]'s jurisdiction under the [CEA], particularly as it relates to event contracts," the CFTC promulgated an Interim Final Rule and Notice of Proposed Rulemaking to clarify its jurisdiction over event contracts as swaps. *Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, 91 Fed. Reg. 65969, 65970 (Oct. 19, 2026) (to be codified at 17 C.F.R. § 1.3) ("Interim Final Rule"); *Further Definition of "Swap" — Inclusions*, 91 Fed. Reg. 66022, 66022 (proposed Oct. 19, 2026) (to be codified at 17 C.F.R. § 1.3) ("NPRM"). The NPRM defines "swap" to "expressly clarify that event contracts, including those based on sports-, politics-, cultural-, and weather-related events, are swaps" under the CEA. 91 Fed. Reg. at 66025. And the Interim Final Rule affirms and codifies the CFTC's "longstanding position that casino-style gambling products, including sports-wagering contracts entered into on a sportsbook and casino games, are not swaps and do not fall within the CFTC's jurisdiction." 91 Fed. Reg. at 65971.

6. The Interim Final Rule and NPRM—promulgated under an express statutory directive to "further define the term[] 'swap,'" 15 U.S.C. §§ 8302(d), 8321(b)—preclude Arkansas' ability to second-guess whether Polymarket US's event contracts are swaps subject to the exclusive jurisdiction of the CFTC. Defendants seek to use Arkansas state courts to do so anyway.

7. The threat to Polymarket US is immediate and concrete. On October 23, 2025, Defendant Arkansas Attorney General Tim Griffin issued a formal opinion concluding that the "business model" of federally designated contract markets amounts to "gambling or gaming and

requires licensure" under Arkansas law on the theory that "rebrand[ing]" event contracts as federally regulated derivatives "does not protect [a contract market] from scrutiny."[1] On November 4, 2026, Defendant Griffin put that theory into effect, filing suit against another designated contract market to enjoin federally regulated derivatives trading because "[r]elabeling bets as 'event contracts' does not supply the authorization Arkansas requires to conduct casino gaming within its borders." Complaint ¶ 89, *State ex rel. Griffin v. KalshiEX LLC*, No. 32CV-26-717 (Ark. Cir. Ct. Independence Cnty. Nov. 4, 2026), Dkt. 1. These actions demonstrate Defendants' willingness to use state law to shut down federally authorized markets despite clear federal preemption. Polymarket US therefore faces a real and imminent risk of enforcement, exposing it to civil penalties, criminal prosecution, forced cessation of operations within Arkansas, and severe collateral consequences to its nationwide operations.

8. The harm resulting from state enforcement would be irreparable. Even a meritless state enforcement action would immediately disrupt Polymarket US's federally authorized operations, fragment a national market, reduce liquidity, jeopardize critical banking and commercial relationships, undermine user trust, and harm Arkansas residents. *Flaherty*, 172 F.4th at 231 (recognizing that enforcement of preempted state gaming laws against another contract market would lead to many of these irreparable harms). Even the *threat* of enforcement forces Polymarket US to choose between exercising its federal right to operate nationwide and submitting to unlawful state coercion. The resulting disruption to a nationally uniform market cannot be remedied through damages. What's more, the chilling effect on lawful activity and the deprivation of Arkansas residents' access to a federally regulated exchange are precisely the harms Congress

[1] Ark. Att'y Gen. Op. No. 2025-073 (Oct. 23, 2025), https://ag-opinions.s3.amazonaws.com/uploads/2025-073.pdf.

sought to prevent when it vested the CFTC with sole regulatory authority over derivatives traded on designated contract markets.

9. Defendants suffer no cognizable harm from being barred from enforcing laws in a domain Congress removed from state control. The State's local interests are already governed and safeguarded by the CFTC's exclusive federal oversight. By contrast, absent judicial intervention, Arkansas' actions threaten to fracture a nationally uniform federal regulatory regime, disrupt lawful markets, burden interstate commerce, and deprive consumers of access to platforms Congress sought to protect. *See Minnesota*, 2026 WL 2150211, at *17 ("[W]hen the state law is likely preempted," "the harm to the state . . . is diminished" and "the public interest" "is less significant"); *Coinbase Fin. Mkts., Inc. v. Raoul*, 2026 WL 2969682, at *17 (N.D. Ill. Oct. 2, 2026) (prediction markets face "imminent civil and criminal penalties under laws that are likely preempted").

10. For these reasons, Polymarket US seeks declaratory and injunctive relief to prevent unlawful state overreach, maintain the integrity of the federal regulatory framework, and avert imminent harm that cannot be remedied after the fact.

**JURISDICTION AND VENUE**

11. This is an action for declaratory and injunctive relief brought under 42 U.S.C. § 1983 and the Court's equitable powers, *see Ex parte Young*, 209 U.S. 123 (1908), to enforce the Supremacy Clause of the United States Constitution. The federal question presented is whether Arkansas state law—including Ark. Const. amend. 100 and Arkansas Racing Commission rules and regulations promulgated thereunder, and Ark. Code Ann. §§ 5-66-101 *et seq.*, 7-1-103, 23-110-101 *et seq.*, 23-117-101 *et seq.*—is preempted by the CEA insofar as it purports to regulate or prohibit Polymarket US's activities governed exclusively by federal law (or otherwise conflicts

with federal law). This Court has jurisdiction to grant the relief sought in this action under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

12. This Court has personal jurisdiction over the Defendants. The Defendants are domiciled and perform their duties in Arkansas.

13. Venue is proper in this District under 28 U.S.C. § 1391(b). All Defendants are residents of the State of Arkansas, and a substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

14. Plaintiff Polymarket US is a Delaware limited liability company with its principal place of business in New York. Polymarket US operates a derivatives exchange and prediction market where users can buy, sell, and exchange financial products known as event contracts. Polymarket US is a designated contract market that is federally regulated by the CFTC pursuant to the CEA.

15. Defendant Tim Griffin is Attorney General of the State of Arkansas. This suit is brought against Attorney General Griffin in his official capacity.

16. Defendant Alex Lieblong is the Chairman and a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Lieblong in his official capacity.

17. Defendant Mark Lamberth is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Lamberth in his official capacity.

18. Defendant Steve Anthony is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Anthony in his official capacity.

19. Defendant Denny East is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner East in his official capacity.

20. Defendant Michael Post is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Post in his official capacity.

21. Defendant John Schmelzle is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Schmelzle in his official capacity.

22. Defendant Steve Landers is a Commissioner of the Arkansas Racing Commission. This suit is brought against Commissioner Landers in his official capacity.

23. Defendants Griffin, Lieblong, Lamberth, Anthony, East, Post, Schmelzle, and Landers have the power and duty to enforce Arkansas gaming laws, including the laws preempted by federal law. Ark. Code Ann. §§ 25-16-702–703; Ark. Const. amend. 100, § 4(a); Ark. Code Ann. §§ 23-110-204; 23-111-204; 23-113-301–302; *see also* Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1.

## FACTUAL AND LEGAL BACKGROUND

### A. Event contracts are derivative financial instruments that incorporate real-time information to generate accurate predictions about real-world events.

24. This case is about derivatives, financial instruments that derive their value from an underlying asset or event. Derivatives, the Supreme Court has long recognized, "are of the utmost importance to the business world." *Bd. of Trade of City of Chi. v. Christie Grain & Stock Co.*, 198 U.S. 236, 248–49 (1905).

25. One common kind of derivative is a "swap." Swaps are financial contracts where two parties agree to exchange (or swap) payments with each other based on a pre-agreed formula—say, the price of crude oil, interest rates, or the outcome of a real-world event.

26. An event contract, in turn, is a swap that is settled "based on the outcome of an underlying occurrence or event." CFTC, *Prediction Markets: Public Interest Determinations*, 91

Fed. Reg. 35806, 35807 n.1 (June 12, 2026); *see also Flaherty*, 172 F.4th at 226 ("'[S]wap' includes event contracts.").

27. Event contracts allow participants "to manage price risks [concerning] whether events stated in the contracts will occur." 91 Fed. Reg. at 35807. For this "type of derivative," the "changing likelihood the event will happen determines fluctuation in the contract price." *Minnesota*, 2026 WL 2150211, at *2.

28. Those events may relate to "sporting events, elections, official government action . . . the weather," or anything else of "potential financial, economic, or commercial consequence." CFTC Complaint ¶¶ 3, 33, *United States v. Minnesota*, No. 26-cv-02661 (D. Minn. May 19, 2026), Dkt. 1 ("CFTC Minn. Compl."); *see* 7 U.S.C. § 1a(47)(A) (defining the term "swap"). The CFTC's recent NPRM would "expressly clarify" that point. 91 Fed. Reg. at 66025; *see id.* at 66029 (proposing to define "swap" to include "[e]vent contracts, including those based on sports-, politics-, cultural, and weather-related events").

29. Event contracts are nothing new. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on interests other than price-based interests," including interests "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25669, 25671 (May 7, 2008). In 1993, for example, the Commission authorized the Iowa Electronic Markets to list contracts pegged to presidential elections. *Id.* at 25670 & n.5. In 2004, "the Commission first designated a prediction market as a designated contract market." 91 Fed. Reg. at 35807.

30. Event contracts often have a "binary payoff structure." 91 Fed. Reg. at 35807 n.1. One party takes the position that a particular event will occur (the "yes" position), and the other takes the position that the event will not occur (the "no" position). The terms of the contract specify its payout and expiration date. For example, the parties might take a position on whether Little Rock will get more than four feet of rain (the approximate yearly average) in 2026. At the end of the year, the party that correctly predicted the outcome is paid the amount stated in the contract by the party whose prediction was incorrect. If 2026 turns out to be an especially wet year and Little Rock sees five feet of precipitation, the party that took the "yes" position on the weather contract would be paid and the party that took the "no" position would not.

31. Event contracts have any number of uses. For example, they can be used to "address[] categories of risk for which traditional financial instruments either do not exist or provide only imperfect hedges." 91 Fed. Reg. at 35866. A boat rental shop along the Buffalo National River might purchase an event contract predicting a particularly dry year. If the weather turns out as the owner predicted, the payout from the contract could offset the owner's loss of income from reduced kayak rentals.

32. Event contracts can have enormous predictive value. Because they can be purchased and sold at any time before the expiration date, the price will reflect the traders' own expectations about the likelihood of a particular outcome. Consider a market on anticipated summer rainfall. As traders buy and sell positions on that contract, its price changes to reflect traders' overall perception about the contract's value. If traders think the outcome is increasingly likely, demand for "yes" positions will increase and so will the price. When the outcome seems less likely, the opposite will occur: Demand for "yes" positions will drop, and the price will drop with it. The result is that the price of the contract will reflect the overall market's view, in real

time, about the probability of the outcome. And those probabilities are set by trading activity, not fixed odds. That is true whether a contract concerns rainfall or the Dallas Cowboys' probability of making the playoffs.

33. As the CFTC observed in its recent NPRM, prediction markets "are rapidly increasing in popularity with the American public both as a financial asset class and as a source of reliable information for news media, sports leagues, financial institutions, and everyday Americans." 91 Fed. Reg. at 35807. Because traders put capital at stake, prediction markets incentivize accurate predictions. And because prediction markets enable real-time trading on a nationwide basis, they aggregate diverse perspectives and rapidly incorporate new information. As a result, prediction markets regularly outperform pundits and polls. *See id.* at 35831.

34. When it comes to "sports forecasting," for example, empirical studies show that prediction markets "significantly outperform" the experts. *E.g.*, M. Spann & B. Skiera, *Sports Forecasting: A Comparison of the Forecast Accuracy of Prediction Markets, Betting Odds and Tipsters*, 28 J. Forecasting 55, 65 (2009).[2]

35. The same is true of elections. Through the final days of the 2024 election campaign, for example, prediction markets accurately predicted President Trump would win a decisive victory, despite the view of many pollsters that the race would be considerably closer.[3] And prediction markets accurately and timely predicted the results of the 2026 midterm election.[4]

---

[2] https://tinyurl.com/2zm5axpc.

[3] *See* Allison Morrow, *How Prediction Markets Saw Something the Polls and Pundits Didn't*, CNN (Nov. 8, 2024, 5:00 AM), https://www.cnn.com/2024/11/08/business/polymarket-election-trump-nightcap; James Bickerton, *Mystery 'Trump Whale' Speaks Out After Winning $50 Million by Defying Polls*, Newsweek (Nov. 8, 2024, 10:57 AM), https://www.newsweek.com/trump-whale-trader-wins-50-million-election-polls-1982768.

[4] Bill Speros, *Prediction Market News: How Accurate Were the 2026 Midterm Markets?*, Rotowire (Nov. 4, 2026, 3:16 PM), https://www.rotowire.com/article/prediction-market-news-how-accurate-were-the-2026-midterm-markets-145240.

36. Event contracts, like other derivatives, provide significant financial value and generate rich information. They allow parties to mitigate risk, although others are equally free to trade; more participants means more liquidity, more efficient trading, and a greater predictive function. Event contracts supply investment opportunities for traders willing to put time and effort into thinking through the likelihood of occurrences in the real world. And, through the collective wisdom of these efficient, transparent markets, event contracts provide real-time information about events that matter to the public at large.

**B. Over the past century, federal regulation of exchange-traded derivatives has become extensive—and exclusive.**

37. For about as long as derivatives trading has existed in the United States, however, individual States have attempted to regulate or prohibit it as unlawful gambling. "[T]he long history of federal regulation" in this area, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 393 (1982), is a direct result of those "coarse attempts" to manage our increasingly "complex society," *Christie Grain*, 198 U.S. at 247–48.

38. The federal government first intervened in 1922, requiring futures transactions for grain to be "consummated on an exchange designated as a 'contract market' by the Secretary of Agriculture." *Merrill Lynch*, 456 U.S. at 360–61.

39. Congress buttressed this federal scheme about a decade later with the CEA but initially left the States a role in regulating these kinds of derivatives. It provided that the federal law would not "impair" the enforcement of "any State law applicable to any transaction" covered by the Act. Pub. L. No. 74-675, § 5, 49 Stat. 1491, 1494 (1936). States were therefore free to "supplement[] or bolster[] the federal scheme." *Rice v. Bd. of Trade of City of Chi.*, 331 U.S. 247, 255 (1947).

40. By the 1970s, however, exchanges had become too important to the national economy to permit the "[v]aried and often conflicting" state laws to interfere with national exchanges subject to federal control. 119 Cong. Rec. 41333 (1973). So Congress created the CFTC and enacted "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex," *Merrill Lynch*, 456 U.S. at 356, "to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC," *Flaherty*, 172 F.4th at 230.

41. To that end, Congress provided that the CFTC would regulate "all" commodity futures when traded on a CFTC-designated contract market. Pub. L. No. 93-463, § 201, 88 Stat. 1389, 1395 (1974). "The statutory definition of 'commodity' is extraordinarily broad and includes practically all goods, articles, services, rights and interests except for onions (due to a history of market manipulation) and movie box-office receipts (because of Hollywood lobbying)." Chairman Michael S. Selig, *WSJ Op-Ed: States Encroach on Prediction Markets*, CFTC (Feb. 17, 2026).[5]

42. Congress granted the CFTC "*exclusive jurisdiction* . . . with respect to accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated" under the CEA. 7 U.S.C. § 2(a)(1)(A) (emphasis added). "The purpose of the exclusive-jurisdiction provision . . . was to separate the functions of the [CFTC] from those of the [SEC] *and other regulatory agencies*." *Merrill Lynch*, 456 U.S. at 386 (emphasis added); *see Kelly v. Carr*, 691 F.2d 800, 804 n.12 (6th Cir. 1980) ("Congress intended to avoid a diversity of regulations between the C.F.T.C. and the states.").

[5] https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

43. Courts immediately recognized "that state regulatory agencies [were] preempted by the 'exclusive jurisdiction' of the CFTC" from encroaching on the CFTC's federal authority. *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *accord, e.g.*, *Leist v. Simplot,* 638 F.2d 283, 322 (2d Cir. 1980); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980); *Westlake v. Abrams*, 504 F. Supp. 337, 343–44 (N.D. Ga. 1980); *Hofmayer v. Dean Witter & Co*., 459 F. Supp. 733, 737 (N.D. Cal. 1978).

44. State officials protested this change. By "giv[ing] exclusive jurisdiction over commodities regulation to the Commodity Futures Trading Commission," one Texas commissioner complained, Congress had "dismantled an effective regulatory system within the states." *Extend Commodity Exchange Act: Hearings on H.R. 10285 Before the Subcomm. on Conservation & Credit of the H. Comm. on Agric.*, 95th Cong. 363–64 (1978). A state securities commissioner from Minnesota bemoaned that, because the CFTC had "the authority to regulate" commodity markets "exclusively," courts had "precluded the application of state securities laws to any transactions involving commodities." *Id.* at 383. And the Secretary of State for Massachusetts demanded that Congress "abolish the exclusive jurisdiction of the CFTC and the consequent preemption of state action against commodity-related fraud." *Id.* at 379.

45. In 1978, Congress responded to those complaints by adding to the CEA a section titled "Jurisdiction of States." Pub. L. No. 95-405, § 15, 92 Stat. 865, 872 (codified as amended at 7 U.S.C. § 13a-2). That section allows a State to sue to enforce the CEA when any person "other than a contract market" "has engaged in, is engaging in or is about to engage in, any act or practice constituting a violation of" the Act. 7 U.S.C. § 13a-2(1). The only state-law proceedings Congress preserved are those "on the basis of an alleged violation of any general civil or criminal antifraud statute." *Id.* § 13a-2(7). The corresponding Senate Report explained why

contract markets were excluded: "Plenary authority to register, regulate, and discipline the contract markets" was "reserved to the [CFTC]." S. Rep. No. 95-850, at 25 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2113. Not long after, the Sixth Circuit explained that the 1978 amendment and the Senate Report "resolved the ambiguity with respect to the states' role in the Commodity Futures industry." *Kelly*, 691 F.2d at 803 n.8.

46. Congress reaffirmed the preemptive effect of the CFTC's exclusive jurisdiction in 1982. When amending federal securities laws to preempt state gaming laws, members of Congress explained that a similar amendment to the CEA was unnecessary: "Similar application of state laws would not apply to futures contracts," because "the CEA gives the CFTC exclusive jurisdiction over futures trading thereby preempting state anti-gaming and bucket shop laws, as well as other state laws." H.R. Rep. No. 97-626, pt. 1, at 9 (1982) (Conf. Rep.).

47. In 2000, Congress broadened the statutory definition of "commodity" to include any "occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." Pub. L. No. 106-554, app. E, § 101(4), 114 Stat. 2763A-371 (2000) (codified at 7 U.S.C. § 1a(19)).

48. Following the 2008 financial crisis, Congress again changed the regulatory landscape. The Dodd-Frank Act of 2010 innovated and expanded CFTC authority in two ways most relevant here.

49. *First*, the Act added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction. As a result, the CFTC now exercises "exclusive jurisdiction . . . with respect to . . . transactions involving swaps . . . traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

50. Event contracts are covered by the Act because payment for event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii) (defining "swap"). Event contracts are also covered by the Act because they have become "commonly known to the trade" as swaps. 91 Fed. Reg. at 66025–26. The CFTC explained that "[f]or decades, the CFTC's position has been that event contracts are derivatives subject to its jurisdiction, whether as 'swaps' or as 'binary options' (which are themselves swaps)"; "[m]arket participants have also overwhelmingly recognized that event contracts are swaps by complying with the CFTC's swap regulatory regime," including by self-certifying "thousands of event contracts based on sports, politics, cultural events, and weather"; and institutional traders and hedgers alike "treat event contracts as swaps and trade them as they do other derivatives products." *Id.* at 66026. The Commission thus "preliminarily conclude[d] that this market practice provides compelling evidence that such event contracts are, in fact, commonly known to the trade as swaps." *Id.*

51. *Second*, the Act introduced what is known as the "Special Rule," which supplies the CFTC the discretion—but not the obligation—to prohibit the trading of "[e]vent contracts" involving subjects including "terrorism," "assassination," "war," and "gaming," if it determines that they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). "By creating a specific public-interest review process, Congress signaled that these contracts fall within the [CFTC]'s exclusive regulatory purview, not the States'." CFTC Minn. Compl. ¶ 60.

52. Were there any doubt, Congress vested the CFTC with "exclusive authority to enforce" Dodd-Frank's swaps provisions, including the Special Rule governing event contracts. 7 U.S.C. § 6b-1(a). And, to ensure consistency and clarity, Congress directed the CFTC to "further

define the term[] ‘swap.’” 15 U.S.C. §§ 8302(d)(1), 8321(b).

53. All told, the CEA grants the CFTC “exclusive jurisdiction” to regulate exchange-traded event contracts, to determine whether they involve “gaming,” and to prohibit them based on the CFTC’s view of the public interest. 7 U.S.C. §§ 2(a)(1)(A), 7a-2(c)(5)(C). And a “purpose of the CEA is to promote responsible innovation,” albeit under the watchful eye of the CFTC. 91 Fed. Reg. at 35829.

54. The CFTC has recently exercised its statutory authority to further define the term “swap.” On October 19, 2026, the CFTC published an Interim Final Rule confirming that “wagers placed on sportsbooks and casino games” are outside the ambit of the agency’s regulatory authority, and that “tradable instruments,” including “[e]vent contracts,” remain well within the CFTC’s exclusive jurisdiction. 91 Fed. Reg. at 65971, 65973, 65975.

55. The same day, the CFTC published the NPRM to ensure that the definition of “swap” includes sports-, politics-, culture-, and weather-related event contracts as swaps and therefore within its exclusive jurisdiction. 91 Fed. Reg. at 66022.

56. The CFTC issued both rules in direct response to decisions that, in the agency’s view, had “deviate[d] from the plain text of the ‘swap’ definition” and “impose[d] atextual limitations on the concept of an ‘event.’” 91 Fed. Reg. at 65971. The Interim Final Rule, effective upon publication in the Federal Register, codifies the CFTC’s longstanding position that casino-style gambling products are not swaps and thereby “clarif[ies] the boundaries between the Commission’s jurisdiction over the derivatives markets and State and Tribal jurisdiction over casino-style gambling.” *Id.* at 65969, 65971. The NPRM, exercising the CFTC’s “express statutory authority to ‘further define’ the term ‘swap,’” would confirm by regulation that event contracts—including sports-related event contracts—are swaps, providing an “independent legal

basis" for that conclusion and "facilitat[ing] uniform nationwide treatment of event contracts under the exclusive jurisdiction of the Commission." 91 Fed. Reg. at 66025, 66031; *see* 15 U.S.C. § 8302(d)(1). In doing so, the CFTC established once again that contract-market-traded event contracts are swaps within the CFTC's exclusive jurisdiction, and casino-style gambling products are not.

**C. The CEA sets forth the comprehensive regulatory framework for event contracts.**

57. The CFTC exercises its exclusive jurisdiction through a comprehensive regulatory framework. Certain derivatives trading in the United States must take place on a board of trade that the CFTC has designated as a contract market. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a). That designation reflects a rigorous federal determination that the contract market satisfies extensive requirements governing market integrity, transparency, financial safeguards, and customer protection.

58. The CFTC-designation process is a demanding one because contract markets are charged with a broad array of functions that the CFTC itself would otherwise have to perform. To obtain approval to operate a designated contract market, an entity must demonstrate to the CFTC that it complies with the CEA's 23 "core principles." 17 C.F.R. § 38.3(a)(2); *see* 7 U.S.C. §§ 7(d), 8(a). Core principle 1 requires the contract market to comply with *all* CFTC regulations. *See* 17 C.F.R. § 38.100(a)(2). And core principle 2 requires that the entity be "transparent" in its criteria for accessing the market, *id.* § 38.151(b)(1), prohibit abusive, "manipulative or disruptive trading practices," *id.* § 38.152, "maintain an automated trade surveillance system capable of detecting and investigating potential trade practice violations" based on "specific trade execution patterns and trade anomalies," *id.* § 38.156, and "conduct real-time market monitoring of all trading activity on its electronic trading platform(s) to identify disorderly trading and any market or system anomalies," *id.* § 38.157.

59. The remaining core principles provide further protection against contract manipulation, ensure that risk controls are in place to limit market disruptions, and require daily publication of the price and volume of actively traded contracts. *See* 17 C.F.R. §§ 38.200–38.301; 7 U.S.C. § 7(d)(8). For example, a designated contract market must "establish, monitor, and enforce compliance with the rules of the contract market," including "access requirements," "the terms and conditions of any contracts to be traded on the contract market," and "rules prohibiting abusive trade practices on the contract market." 7 U.S.C. § 7(d)(2)(A). And those rules must provide "impartial access to its markets and services" using "[a]ccess criteria that are impartial, transparent, and applied in a non-discriminatory manner." 17 C.F.R. § 38.151(b). According to recent guidance from the CFTC, designated contract markets "must operate on a uniform basis at a national scale in order to achieve the CEA's purpose" and cannot "limit access based on the location of an otherwise eligible market participant." CFTC, *DCM Impartial Access Requirements* 4 (Nov. 5, 2026).[6] The alternative—access restrictions based on trader location—would fragment "a national pool of liquidity," impair price discovery, and arbitrarily restrict users who travel into a restricted State, "undermining [market] integrity and efficiency." *Id.* at 4–5. These rules, the CFTC has explained, "establish important protections for derivatives markets, market participants, and the general public." CFTC Minn. Compl. ¶ 43.

60. In short, to obtain designation as a contract market, applicants must show that they can be trusted to establish, monitor, and enforce rules for the markets they operate. As the CFTC has explained, contract markets are "self-regulatory organizations[] subject to Commission oversight" that must "meet[] the stringent requirements" under the CEA. 91 Fed. Reg. at 35843;

[6] https://www.cftc.gov/media/14841/DCMImpartialAccessInterpretiveGuidance110526/download.

*see* 7 U.S.C. § 5(b) (purpose of the CEA is to "serve the public interest[] . . . through a system of effective self-regulation of trading facilities").

61. Designated contract markets may not list new kinds of contracts on their exchanges without first submitting the contract for CFTC approval or certifying that the contract complies with federal law and the CFTC's requirements. 7 U.S.C. § 7a-2(c)(1). Before listing a new contract, the designated contract market must supply the CFTC with a "certification . . . that the product to be listed complies with the [CEA]" and CFTC regulations, as well as "[a] concise explanation and analysis"—with accompanying documentation—"with respect to the product's terms and conditions" and "the product's compliance with applicable provisions of the Act, including core principles, and the Commission's regulations," among other things. 17 C.F.R. § 40.2(a); *see* 7 U.S.C. § 7a-2(c)(1).

62. More broadly, the CFTC wields considerable tools for enforcing the CEA and its regulations. For example, the CEA empowers the agency to subpoena testimony and documents, 7 U.S.C. § 9(5), bring administrative enforcement actions, *id.* §§ 9(4), 13b, and sue in federal court for injunctive relief, monetary penalties, the appointment of receivers, disgorgement, restitution, the rescission of contracts, and the imposition of trading and registration bans, *id.* § 13a-1.

**D. The CFTC licenses Polymarket US as a designated contract market subject to federal law and the CFTC's exclusive jurisdiction.**

63. The CFTC granted Polymarket US its designation as a contract market on July 9, 2025, finding that the platform now doing business as Polymarket US could and would comply

with the CEA and the CFTC's regulations. Order of Designation at 3, *In re Application of QCX LLC for Designation as a Contract Market*, Commodity Futures Trading Comm'n (July 9, 2025).[7]

64. Today, Polymarket US specializes in contracts concerning real-world events of public interest. Since September 30, 2025, Polymarket US has self-certified various financial, election-related, and sports-related event contracts. *See* 7 U.S.C. § 7a-2(c); CFTC, Designated Contract Market Products (listing self-certifications for contracts).[8]

65. These event contracts fall within the heart of the CFTC's exclusive jurisdiction. Payment on one of Polymarket US's listed event contracts is "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

66. One example is event contracts that were based on which political party will control the United States Senate or United States House of Representatives following the November 3, 2026, elections. Businesses, investors, financial institutions, and consumers routinely adjust their behavior based on which party will control Congress because legislative control can affect taxation, spending, regulation, and other matters with significant economic effects.

67. Another example is event contracts based on the winner of the Super Bowl. The Super Bowl's "associat[ion] with a potential financial, economic, or commercial consequence" is obvious. 7 U.S.C. § 1a(47)(A)(ii); *see Coinbase*, 2026 WL 2969682, at *7 ("Winning a title game likely 'associate[s] with a potential financial, economic, or commercial consequence.'"). Winning the Super Bowl causes a team's valuation to surge, retailers' sales of merchandise of that team to

---

[7] https://www.cftc.gov/filings/documents/2025/orgdcmqcexorderofd250709.pdf.

[8] https://tinyurl.com/yamausyk.

skyrocket, and hometown sales to spike. In 2025, for example, the Eagles took in over $1 billion in revenue from their 2025 win, with Philadelphia restaurants, retailers, and hotels also able to capitalize on the team's success.[9] Retailers also regularly tie promotions to game results, including the identity of the winning team, final score, and game duration.[10]

68. Sports-related event contracts are not the same as sportsbooks. The financial products and regulatory regimes differ in fundamental ways.

69. Event-contract prices are formed by matching buyers and sellers among diverse market participants, with users from any given state transacting with other users around the country on these nationwide exchanges. Sports betting, by contrast, is conducted through local sportsbooks—regulated at the state level—with each sportsbook independently setting the terms of its wagers. 91 Fed. Reg. at 65972–73. The basic structure of sports betting and derivatives markets is different. Sportsbooks set odds based on proprietary information; event contracts are priced by supply and demand in a relevant market without any input by Polymarket US—*i.e.*, buying and selling activity reflecting the diverse perspectives of millions of individual traders on a given event. *Id*. at 65972–74. And sports bettors typically place wagers against the "house," so sports bettors and sportsbooks are counterparties to the bet. *Id*. Polymarket US, however, does

---

[9] *See, e.g.*, Rachel Moore, *Eagles to Generate $1.2B Economic Impact with Super Bowl, Parade, Season*, PHL17 News (Feb. 13, 2025, 9:43 AM), https://phl17.com/phl17-news/eagles-to-generate-1-2b-economic-impact-with-super-bowl-parade-season/; Jensen Toussaint, *Philadelphia Eagles Valuation Likely to Skyrocket After Second Super Bowl Win*, Philadelphia.Today (Feb. 14, 2025, 6:44 AM), https://philadelphia.today/2025/02/philadelphia-eagles-valuation-to-rise/.

[10] *See, e.g.*, *Buffalo Wild Wings (@bwwings)*, Instagram (Feb. 8, 2026), https://www.instagram.com/p/DUgIPoekVo8/ (promising free wings if Super Bowl goes to overtime); Little Caesars, *Little Caesars Road to the Super Bowl Sweepstakes*, https://mobilestatic.littlecaesars.com/documents/Little%20Caesars%20-%20NFL%20Super%20 Bowl%202026%20Sweepstakes.pdf (last visited Feb. 8, 2026) (conditioning chance to win free Super Bowl ticket on predicting how a customer's favorite team will perform); Iluminere, *Taco Bueno Dallas Cowboys Campaign*, https://iluminere.com/awards-taco-bueno-cowboys/ (last visited Apr. 10, 2026) (offering free tacos the day after every Dallas Cowboys win).

not operate as a counterparty in the derivatives market. Instead, it operates as a transparent, centralized exchange matching orders of third parties. Polymarket US also makes money in a way that is neutral—by charging a flat fee for each transaction. It does not make money when a bettor loses, and it makes the same amount regardless of the outcome of a particular event.

70. Federal law governs event contracts of all kinds—including sports-related ones—traded on designated contract markets. That is, all derivative instruments listed on centralized exchanges operate pursuant to extensive federal product certification, registration, and approval procedures. Sports-event contracts, like any other "transactions subject to" the CEA, "are entered into regularly in interstate . . . commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). They are therefore traded on a national exchange and regulated on the national level to ensure "trading in liquid, fair and financially secure trading facilities." *Id.*

**E. The CFTC has vigorously defended its exclusive jurisdiction over designated contract markets.**

71. The CFTC has resisted States' attempts to encroach upon its exclusive jurisdiction over designated contract markets. It has publicly advocated for its exclusive prerogative to regulate event contracts, assertively pursued litigation, and acted as an amicus in support of private parties' fights against States' jurisdictional overreach.

72. Earlier this year, CFTC Chairman Selig reiterated that "prediction markets" and "event contracts" "have operated within the CFTC's regulatory perimeter for more than two decades" and have played an "important role . . . in the broader financial system."[11] He warned

[11] Remarks of Chairman Michael S. Selig, *The Next Phase of Project Crypto: Unleashing Innovation for the New Frontier of Finance* (Jan. 29, 2026), https://www.cftc.gov/PressRoom/

that state litigation against federally regulated markets injects uncertainty that "has not served our markets well" and harms "the public interest." *Id.* "The CFTC will no longer sit idly by," he admonished, "while overzealous state governments undermine the agency's exclusive jurisdiction over these markets by seeking to establish statewide prohibitions on these exciting products."[12]

73. The CFTC has followed through with this warning. In recent months, the Commission has sued numerous States that have sought to outlaw, regulate, or otherwise restrain federally regulated prediction markets.[13]

74. The CFTC explained that those state efforts "intrude[] on the exclusive federal scheme Congress designed to oversee the derivatives industry," and would "undermine[] [the] uniformity" Congress mandated, *see* CFTC Minn. Compl. ¶¶ 7, 82, by subjecting CFTC-regulated exchanges to a "fragmented patchwork of state regulations" that have "resulted in poorer consumer protection and increased risk of fraud and manipulation," *CFTC Sues Trio of States to Reaffirm Its Exclusive Jurisdiction Over Prediction Markets*, Press Release No. 9206-26 (Apr. 2, 2026).[14] The CFTC also emphasized that event contracts traded on designated contract markets are "swaps" within the meaning of the CEA and fall squarely within the CFTC's exclusive jurisdiction, which prohibits States from "invad[ing]" that authority. *See, e.g.*, CFTC Minn. Compl. ¶¶ 9, 32. Those federally regulated markets include Polymarket US. *See id.* ¶ 44.

---

SpeechesTestimony/opaselig1.

[12] *Chairman Michael S. Selig: Op-Ed: States Encroach on Prediction Markets*, Commodity Futures Trading Comm'n (Feb. 17, 2026), https://www.cftc.gov/PressRoom/SpeechesTestimony/seligstatement021726.

[13] *See, e.g.*, Complaint, *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Apr. 2, 2026), Dkt. 1; Complaint, *United States v. Illinois*, No. 1:26-cv-03659 (N.D. Ill. Apr. 2, 2026), Dkt. 1; CFTC Minn. Compl.; Mot. to Intervene & Proposed Compl. in Intervention, *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026), Dkt. 19; Complaint, *United States v. New Mexico*, No. 1:26-cv-01912 (D.N.M. June 12, 2026), Dkt. 1 ("CFTC N.M. Compl.").

[14] https://www.cftc.gov/PressRoom/PressReleases/9206-26.

75. The result would be a "massive sea change" that poses "existential" harm to national markets. CFTC Amicus Brief 20, 28, *KalshiEX LLC v. Williams*, No. 26-1835 (2d Cir. Sept. 8, 2026), Dkt. 51.1 ("Second Circuit Br."). The CFTC's suits and motions for preliminary injunctions against states like Connecticut, Illinois, Minnesota, New Mexico, New York, Rhode Island, and Wisconsin thus aim "to halt [state] efforts to apply and enforce preempted state laws to national markets that are governed by federal law." *See, e.g.*, CFTC N.M. Compl. ¶ 1.[15]

76. A federal district court recently preliminarily enjoined Minnesota from enforcing state law against CFTC-regulated contract markets, including Polymarket US. *Minnesota*, 2026 WL 2150211, at *10–15. The court held that the CEA's "exclusive jurisdiction" language likely expressly preempts state regulation of event contracts that qualify as "swaps," and emphasized the breadth of that definition—an event contract qualifies where "the occurrence of an event has the capacity to result in the identified consequence in the future." *Id.* at *12–15.

77. More recently, on October 2, 2026, the Northern District of Illinois preliminarily enjoined Illinois from enforcing state law against a subset of sports-related contracts "dependent on who will win or lose a title game." *Coinbase*, 2026 WL 2969682, at *5. The court similarly emphasized that the definition of "swaps" "reads about as broadly as it could." *Id.* at *7. In granting the preliminary injunction motion, the court concluded that the state laws Illinois attempted to enforce against prediction markets "likely conflict[] with the [CEA] and [are] accordingly likely preempted." *Id.* at *16.

[15] *See, e.g.*, Mot. for Prelim. Inj., *United States v. Connecticut*, No. 3:26-cv-00498 (D. Conn. Sept. 11, 2026), Dkt. 102; Mot. for Prelim. Inj., *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. June 17, 2026), Dkt. 31; Mot. for Prelim. Inj., *United States v. Minnesota*, No. 26-cv-2661 (D. Minn. May 19, 2026), Dkt. 25; Mot. for Prelim. Inj., *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 18, 2026), Dkt. 13; Mot. for Prelim. Inj., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. May 29, 2026), Dkt. 23.

**F. Arkansas files suit against another events-market operator and threatens to pursue Polymarket US and other events-market operators for state law penalties.**

78. Defendants consistently assert the authority to regulate prediction markets. In October 2025, Arkansas Attorney General Tim Griffin issued a formal opinion concluding that a "business model" like that of another designated contract market, KalshiEX, "requires licensure" by the Racing Commission. Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1. Offering event contracts in Arkansas, the theory has it, constitutes "gambling or gaming" within the meaning of Arkansas law and requires a gaming license. *Id.* at 1–2. The Attorney General further concluded that it is unlawful to "'receive or transmit information' concerning sports or games 'for the purpose of gaming,'" and that any related data transmission "violate[s] the law as well." *Id.* at 2 (quoting Ark. Code Ann. § 5-66-114(a)). Without disputing that prediction markets like KalshiEX operate federally licensed designated contract markets or that event contracts traded on designated exchanges are regulated exclusively by the CFTC, the Attorney General dismissed the entire prediction market business model as mere "rebrand[ing]" because Arkansas' gambling laws must be "'liberally'" construed "'in favor of the prohibition'" on gaming. *Id.* at 1–2 (quoting Ark. Code Ann. § 5-66-101).

79. On November 4, 2026, Attorney General Griffin followed up on this theory by launching a state-court enforcement action against another federally designated contract market on the basis that the prediction market offers unlicensed wagering in violation of state law. Complaint, *State ex rel. Griffin v. KalshiEX LLC*, No. 32CV-26-717, Dkt. 1. The State alleges violation of the Arkansas Deceptive Trade Practices Act and unjust enrichment premised, in part, on the purported illegality of event contracts under state law. *Id.* ¶¶ 162–211. The State broadly challenges sports-, election-, and culture-related contracts, *id.* ¶¶ 57, 82, and seeks, among other things, to enjoin derivatives trading in the State, unwind past and outstanding event contract trades,

and impose civil penalties of up to $10,000 for each violation of Arkansas' licensed gaming regime, assessed on a "per sale" or "individual" transaction basis, *id.* ¶ 170, p. 56.

80. These are not the only times that Defendants have taken a stance against prediction markets and in favor of state regulation of such markets. Attorney General Griffin also signed the multistate amicus brief in support of New Jersey following the Third Circuit's decision holding that New Jersey's licensing regime is preempted as applied to event contracts. Brief of Amici Curiae Ohio, 38 Other States, and the District of Columbia in Support of Petitioners at 9, *Flaherty v. KalshiEX, LLC*, No. 26-299 (U.S. Oct. 7, 2026). Attorney General Griffin previously signed other amicus briefs, each time in support of state regulators asserting authority over federally regulated prediction markets,[16] and has also signed comment letters submitted in response to CFTC rulemakings, each time contesting the CFTC's authority to regulate event contracts.[17]

81. Collectively, these statements and actions demonstrate animus toward—and an intent to bring the weight of state regulatory authority against—prediction markets like Polymarket US.

---

[16] *See, e.g.,* Brief of Amici Curiae Nevada, Ohio, 32 Other States, District of Columbia, and Northern Mariana Islands, *KalshiEX LLC v. Flaherty*, No. 25-1922, Dkt. 29 (3d Cir. June 17, 2025); Brief of Amici Curiae Nevada, Ohio, 36 Other States, and District of Columbia, *KalshiEX LLC v. Martin*, No. 25-1892, Dkt. 41 (4th Cir. Dec. 22, 2025); Brief of Amici Curiae Ohio, New Jersey, 37 Other States, and the District of Columbia, *Robinhood Derivatives, LLC v. Dreitzer*, No. 25-7831, Dkt. 81 (9th Cir. Mar. 10, 2026).

[17] Comment letter from Ohio, Nevada, New Jersey, New York, Tennessee, Utah, 24 other States, and the District of Columbia, Cmt. No. 115653 for Proposed Rule 91 FR 12516 (Apr. 30, 2026), available at https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=36062; Comment letter from Ohio, Kentucky, Maryland, Nevada, New Jersey, New York, Tennessee, Utah, and 36 other States, CFTC-2026-1189-0174 (July 27, 2026), available at https://downloads.regulations.gov/CFTC-2026-1189-0174/attachment_1.pdf.

**G. Looming enforcement of preempted Arkansas law irreparably harms Polymarket US.**

82. Given the State's definitive position—that federally regulated event contracts constitute "gambling" under Arkansas law and that federally licensed nationwide exchanges may not offer them without an Arkansas gaming license, Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1; Complaint ¶¶ 87–89, *State ex rel. Griffin v. KalshiEX LLC*, No. 32CV-26-717, Dkt. 1—Polymarket US faces the imminent threat of enforcement by Arkansas.

83. The threat of enforcement against Polymarket US is real, imminent, and concrete, presenting a live and justiciable controversy. Because Polymarket US must choose between protecting its rights under federal law and facing exposure to imminent state enforcement, this action is ripe for adjudication and the award of injunctive relief now, not after irreparable harm has occurred.

84. The business consequences for Polymarket US arising from Arkansas' near-certain enforcement require this Court's immediate action. An enforcement action by Arkansas—even a meritless one—would raise a red flag for Polymarket US's business partners, triggering notification and termination clauses in many of Polymarket US's agreements, and jeopardizing key partnerships crucial to the company's growth. Additionally, Polymarket US would lose out on potential business partners who would steer clear of a company under a cloud of enforcement proceedings.

85. The alternative—abruptly terminating Arkansas users' access to event contracts and unwinding their current positions—is just as damaging. Polymarket US has expended tremendous resources to garner customer goodwill and a solid reputation. Cutting off Arkansans from its event contracts—contracts that are available to users outside Arkansas—would deal a decisive blow to Polymarket US's goodwill and reputation within the State. It would disrupt

overall liquidity and impair the information that trading generates by forcing Arkansas residents off the exchange. And it would create confusion among users about what shutting off their access to the market means for their trading positions. Unwinding existing contracts, in particular, would confuse and frustrate both Arkansans and users resident elsewhere on the other side of the contracts.

86. Further, reduced liquidity would deter customers from using the platform. Price discovery and market efficiency are two main reasons why event contracts have predictive value (and thus why Polymarket US is attractive to users). Reduced liquidity dampens both, which are necessary elements of prediction markets' functions, so termination of Arkansas-based trading hinders the orderly functioning of markets nationwide and could deter customers outside Arkansas from using the platform at all, accentuating the harm to Polymarket US's nationwide business.

87. All told, "the prospect of" an imminent enforcement action irreparably harms Polymarket US by putting it to an impossible choice: continue operations "and expose [itself] to potentially huge liability," on the one hand; or "suffer the injury of obeying the [preempted] law" on the other. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992); *see Coinbase*, 2026 WL 2969682, at *17 (prediction markets "must choose between ceasing business operations and facing imminent civil and criminal penalties under laws that are likely preempted"). There is therefore "'no adequate remedy at law.'" *Id*. (quoting *Trans World*, 504 U.S. at 381).

**COUNT I**

**Commodity Exchange Act Preemption**

**(42 U.S.C. § 1983; *Ex parte Young*)**

88. Polymarket US incorporates the preceding paragraphs by reference.

89. The Supremacy Clause of the United States Constitution enshrines the "Laws of the United States" as "the supreme Law of the Land," the "Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

90. "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal quotation marks omitted).

91. "[F]ederal law may supersede state law in several different ways." *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 357 (8th Cir. 1993). "Congress is empowered to pre-empt state law by so stating in express terms." *Id.* "In the absence of express pre-emptive language, Congress' intent to pre-empt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive." *Id.* And "[e]ven where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Id.* at 358.

92. Polymarket US brings this claim pursuant to 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908), and seeks declaratory and injunctive relief preventing Defendants from enforcing Arkansas law against Polymarket US in violation of federal law. As explained below, Arkansas' gaming laws are preempted by the CEA as applied to Polymarket US's federally regulated exchange.

93. The CEA bars Arkansas from purporting to regulate Polymarket US's federally regulated offering of event contracts under each form of preemption.

**A. Express preemption bars Arkansas regulation of Polymarket US's exchange.**

94. Congress expressly preempted state regulation of event-contract trading on designated contract markets.

95. Under the CEA's express terms, the CFTC, not Arkansas, has "exclusive jurisdiction with respect to" all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A).

96. Confirming as much, the very next sentence explains that the section does not "supersede or limit the jurisdiction" of "regulatory authorities under the laws of the United States or of any State," "*[e]xcept as hereinabove provided*." 7 U.S.C. § 2(a)(1)(A) (emphasis added).

97. The CFTC's "exclusive jurisdiction" over trading on federally regulated event-contract exchanges, 7 U.S.C. § 2(a)(1)(A), therefore preempts Arkansas' supposed jurisdiction to police those exchanges, *see Minnesota*, 2026 WL 2150211, at *10 ("[C]ourts have recognized that § 2(a)(1)(A)'s 'exclusive jurisdiction' language has a preemptive effect on state regulation."); *Flaherty*, 172 F.4th at 230 (observing that the CEA's "text preempts state gambling laws that seek to regulate . . . event contracts traded on a [contract market]" under the CFTC's exclusive jurisdiction).

98. In addition, Section 13a-2 of the CEA bars Arkansas from enforcing its gambling laws against a designated contract market. Congress defined the extent of state authority to proceed against conduct the CEA regulates. 7 U.S.C. § 13a-2. A State may sue a person who violates the CEA or CFTC regulations, but Congress expressly excluded "contract market[s]" from

that authority. *Id.* § 13a-2(1). And Congress preserved only one category of state law actions, namely proceedings brought under a State's "general civil or criminal antifraud statute." *Id.* § 13a-2(7).

99. These two limitations foreclose Arkansas' anticipated enforcement. *First*, Congress excluded contract markets by name. 7 U.S.C. § 13a-2(1). Congress withheld that authority to sue because "[p]lenary authority to register, regulate, and discipline the contract markets" is "reserved to the Commission." S. Rep. No. 95-850, at 25. Congress could not have intended to deny States authority to enforce the CEA against contract markets while simultaneously permitting them to achieve the same result through state gambling laws. *See Kelly*, 691 F.2d at 803 n.8. *Second*, Congress preserved only actions brought under "general civil or criminal antifraud statute[s]." 7 U.S.C. § 13a-2(7). When Congress specifically identifies the state law claims that may coexist with a federal regulatory scheme, the remainder are preempted. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982). The "specific allowance of antifraud proceedings must [therefore] be deemed to preclude antigambling proceedings." *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981); *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 163 (1982).

100. Arkansas says that event contracts are "gambling or gaming" requiring licensure, and that facilitating sports wagers or transmitting data "for gaming purposes" violates the law. Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1, at 1–2. That is not true. *See supra* ¶¶ 24–36, 68–70. Moreover, the CEA's Special Rule anticipates that certain "event contracts" will "involve . . . gaming" and authorizes the CFTC to ban the trading of those contracts. 7 U.S.C. § 7a-2(c)(5)(C). Thus, even if sports-event contracts *were* a form of gaming (they are not), they would remain within the CFTC's exclusive jurisdiction and beyond the State's regulatory reach.

**B. Implied field preemption bars Arkansas regulation of Polymarket US's exchange.**

101. Field preemption applies where "the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Qwest Corp. v. Minnesota Pub. Utilities Comm'n*, 684 F.3d 721, 726 (8th Cir. 2012) (cleaned up). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Id.* (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)). Through the CEA, Congress has done just that for event-contract trading on designated contract markets. "As the scope of the CEA and the long history of amendments to it make clear, Congress created 'a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex.'" CFTC Minn. Compl. ¶ 89 (quoting *Merrill Lynch*, 456 U.S. at 356).

102. "Congress created the CFTC and amended the Act to do away with the patchwork of state regulations and bring futures trading on [designated contract markets] under the exclusive jurisdiction of the CFTC." *Flaherty*, 172 F.4th at 230. And through this "grant[ of] exclusive jurisdiction to the Commodity Future[s] Trading Commission," together with the "pervasive regulatory scheme established under the Commodity Exchange Act," as amended, Congress achieved its goal of "preempt[ing] the field insofar as futures regulation is concerned." *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.*, 1982 WL 1348, at *2 (S.D.N.Y. Nov. 10, 1982).

103. The field occupied by federal law expanded when the Dodd-Frank Act "amended the [CEA] to 'establish a comprehensive new regulatory framework for swaps,' and vested the [CFTC] with exclusive jurisdiction to implement that framework." *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 445 (S.D.N.Y. 2017) (footnote omitted) (quoting 78 Fed. Reg. 33476, 33477 (June 4, 2013)). The CFTC is exercising that authority to confirm that "event

contracts" are swaps and that casino gambling transactions, including sports wagers, are not. *See* 91 Fed. Reg. at 66025; 91 Fed. Reg. at 65971.

104. There is no room for state interference with this "comprehensive scheme." *See CFTC v. British Am. Commodity Options Corp.*, 560 F.2d 135, 138 (2d Cir. 1977).

105. Enforcement of Arkansas' gaming laws against Polymarket US would impermissibly intrude on the CFTC's exclusive authority to police trading on CFTC-regulated exchanges. *See Flaherty*, 172 F.4th at 228 (holding that "at the very least[,] field preemption applies" to sports-related event contracts on a designated contract market).

**C. Conflict preemption bars Arkansas regulation of Polymarket US's exchange.**

106. Conflict preemption also prevents enforcement of these Arkansas laws against Polymarket US because those laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000); *see also Flaherty*, 172 F.4th at 229 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed [contract markets].").

107. Consider the State's position that Polymarket US's federally regulated sports-event contracts are unlawful "casino gaming." Ark. Const. amend. 100, § 3(a); Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1, at 1; Complaint ¶ 31, *State ex rel. Griffin v. KalshiEX LLC*, No. 32CV-26-717, Dkt. 1. That is not the State's decision to make: The CEA grants the *CFTC* the authority to "determine[]" whether such contracts "involve . . . gaming" and, if so, whether they should be prohibited as "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

108. Common sense confirms all this. The Chicago Mercantile Exchange, for example, is not the MGM Grand, though a customer of either might end up losing money. But if

States were free to regulate derivatives as gambling—subject to each State's rigid-yet-idiosyncratic restrictions and licensing regimes—the modern financial system would cease to function. The CEA ensures that this cannot happen.

109. The CFTC has not invoked the Special Rule to prohibit Polymarket US from listing sports-event contracts. Therefore, Polymarket US's sports-related event contracts evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them. *See Flaherty*, 172 F.4th at 226 ("The Act preempts state laws that directly interfere with swaps traded on [contract markets]."). Were there any doubt, the CFTC is finalizing regulations *confirming* that these event contracts ordinarily will not be prohibited under the Special Rule. *See* 91 Fed. Reg. at 35818, 35835.

110. More broadly, if Arkansas attempts to ban Polymarket US's event contracts that federal law and the CFTC have authorized, the State's actions would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. As the Supreme Court has recognized, "[t]he purpose of the exclusive-jurisdiction provision" is, among other things, to "separate the functions of the [CFTC] from those of . . . other regulatory agencies." *Merrill Lynch*, 456 U.S. at 386. Permitting an Arkansas enforcement action against Polymarket US would conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes—a conflict that becomes clearer still when one considers that nothing would stop the 49 other States and the District of Columbia from equally attempting to subject Polymarket US's exchange to their own varying laws. "This state regulation is exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230. The CFTC has said the same: Because Congress identified a "national public interest" in derivatives trading, those markets "must operate on a uniform basis at a national scale in order to achieve the CEA's purpose." *DCM*

*Impartial Access Requirements* 4 (quoting 7 U.S.C. § 5(a)). What's more, the CFTC warned, state efforts to undermine the CFTC's exclusive jurisdiction over event contracts "threatens to wreak havoc on the operations of [contract markets] nationwide" and "imperil a nascent industry that Congress has entrusted to the [agency's] 'exclusive jurisdiction.'" 91 Fed. Reg. 65969, 65977.

111. Compliance with both regimes is also impossible in practice. Federal law requires a designated contract market to provide "impartial access to its markets and services" on a non-discriminatory basis, 17 C.F.R. § 38.151(b), and the CFTC has explained that designated contract markets may not "limit access based on the location of an otherwise eligible market participant within the United States." *DCM Impartial Access Requirements* 4; Second Circuit Br. 18. Arkansas' position that event contracts are unlawful "gaming" absent a license, Ark. Att'y Gen. Op. No. 2025-073, *supra* note 1, at 1–2, would require Polymarket US to do exactly that. So would compliance with the State's licensing regime, which compels participants to serve only those in Arkansas, at the expense of residents of every other State. Ark. Const. amend. 100, § 3(a); 23 CAR §§ 358-425(g)(1); 358-2006(a); 358-2007(a)(2); 358-2021(a)(1); 358-2022(5).

112. In short, Arkansas may not enforce against Polymarket US state laws that federal law preempts.

**PRAYER FOR RELIEF**

An actual controversy has arisen between the parties entitling Plaintiff to legal, declaratory, and injunctive relief.

WHEREFORE, Plaintiff Polymarket US respectfully requests that this Court enter the following relief:

A. A declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C. § 1983, and Rule 57 of the Federal Rules of Civil Procedure, that Ark. Const. amend. 100 and Arkansas Racing

Commission rules and regulations promulgated thereunder, Ark. Code Ann. §§ 5-66-101 *et seq.*, 7-1-103, 23-110-101 *et seq.*, and 23-117-101 *et seq*. are preempted under the CEA as applied to Polymarket US;

B. Preliminary and permanent injunctions, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from taking any steps to enforce against Plaintiff Ark. Const. amend. 100 and Arkansas Racing Commission rules and regulations promulgated thereunder, Ark. Code Ann. §§ 5-66-101 *et seq.*, 7-1-103, 23-110-101 *et seq.*, 23-117-101 *et seq.*, or any other state law or regulation to the extent it purports to regulate or prohibit Plaintiff's activities governed exclusively by federal law or otherwise conflicts with federal law;

C. An award of Plaintiff's attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988 for successful 42 U.S.C. § 1983 claims; and

D. Any other relief within this Court's discretion that it deems just and proper.

Dated: November 9, 2026

Respectfully submitted,

*/s/ Sarah Keith-Bolden*

QUATTLEBAUM, GROOMS & TULL PLLC

Steven W. Quattlebaum (Bar No. 84127)
Sarah Keith-Bolden (Bar No. 2007235)
Madison A. Dedrick (Bar No. 2025218)
111 Center Street, Suite 1900
Little Rock, AR 72201
Telephone: 501.379.1700
quattlebaum@qgtlaw.com
sbolden@qgtlaw.com
mdedrick@qgtlaw.com

GIBSON, DUNN & CRUTCHER LLP

Orin Snyder*
Matt Benjamin*
Rachel Jackson*
Liesel Schapira*
Amanda LeSavage*
200 Park Avenue
New York, NY 10166
Telephone: 212.351.4000
osnyder@gibsondunn.com
mbenjamin@gibsondunn.com
rjackson@gibsondunn.com
lschapira@gibsondunn.com
alesavage@gibsondunn.com

Thomas H. Dupree, Jr.*
Jacob T. Spencer*
Adam I. Steene*
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: 202.955.8500
tdupree@gibsondunn.com
jspencer@gibsondunn.com
asteene@gibsondunn.com

**Applications for pro hac vice forthcoming*

*Attorneys for Plaintiff QCX LLC, d/b/a Polymarket US*